MICHAEL I. GOTTFRIED (State Bar No. 146689)
mgottfried@lgbfirm.com
ROYE ZUR (State Bar No. 273875)
rzur@lgbfirm.com
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 700
Los Angeles, California 90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056

Proposed Attorneys for Debtor
and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>TAMRAC, INC.,<br><br>      Debtor and<br>      Debtor-In-Possession. | Case No. 1:14-bk-10076-MT<br><br>Chapter 11<br><br>**DECLARATION OF JESSELYN T. CYR IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS**<br><br>**<u>Hearing Date and Time:</u>**<br>Date:    January 7, 2014<br>Time:    1:30 p.m.<br>Place:    Courtroom 302<br>           21041 Burbank Blvd.<br>           Woodland Hills, CA 91367 |

I, Jesselyn T. Cyr, hereby declare as follows:

1. I have personal knowledge of the facts set forth herein and, if called to testify, I could and would competently testify thereto.

2. I am the President and a shareholder of Tamrac, Inc., the debtor and debtor-in-possession in the above-captioned bankruptcy case ("Tamrac" or the "Debtor"). The Debtor's Board of Directors has authorized me to act on the Debtor's behalf in this bankruptcy case.

3. I make this declaration in support of the following emergency motions for "first day" relief (collectively, the "Emergency Motions") filed concurrently herewith:

   a) *Debtor's Emergency Motion for Order Determining Adequate Assurance of Payment for Post-petition Utility Services* (the "Utilities Motion");

   b) *Debtor's Emergency Motion for Authority to (1) Pay Pre-Petition Wages and Insurance Premiums and (2) Honor Accrued Vacation and Leave Benefits* (the "Employee Motion");

   c) *Debtor's Emergency Motion For Order Authorizing, But Not Directing, The Debtor To Pay (1) Pre-Petition Claims Of Certain Statutory Lien Claimants; And (2) Certain Customs Duties And Similar Incidental Pre-Petition Import Expenses* (the "Lien Claimant Motion");

   d) *Debtor's Emergency Motion For Order: (1) Approving Use Of Cash Collateral On An Interim Basis And Provision Of Adequate Protection; (2) Authorizing Debtor In Possession Financing Pursuant To 11 U.S.C. § 364(b); And (3) Setting A Final Hearing Pursuant To Bankruptcy Rule 4001* (the "Cash Collateral Motion");

   e) *Debtor's Emergency Motion For Order: (1) Authorizing Temporary Continued Use Of Existing Bank Accounts; And (2) Approving Post-Petition Cash Management System* (the "Cash Management Motion"); and

   f) *Debtor's Motion for Order Extending the Time to File Schedules of Assets and Liabilities and Statement of Financial Affairs.*

4. I have reviewed each of the Emergency Motions and believe that the relief sought

LANDAU GOTTFRIED & BERGER LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

in each of them is essential to ensuring the uninterrupted operation of the Debtor's business and to the successful administration of its bankruptcy case.

5. Tamrac is one of the world's leading manufacturers of high-end photographic equipment carrying systems, including cases, bags, and backpacks, with distribution throughout approximately 70 countries worldwide. Based in Chatsworth, California, Tamrac was founded in 1977 by a group of outdoor enthusiasts who loved nature photography. Like many other amateur and professional photographers in California, Tamrac's founders found a strong need for photographic equipment carrying systems that were tough enough for California's diverse terrains and that allowed fast access to photographic equipment to capture spontaneous images.

6. Today, the Debtor continues to innovate and manufacture products based on photographers' evolving needs and requests, and to maintain the highest and strictest quality standards with an attention to detail that is unmatched by any competitor. Several of the Debtor's inventions are patented within the United States. Among the Debtor's innovations are the following: Total Coverage Tops, Pop-Off™ Film Pockets, ZipDrop™ Pockets, the Lens-Bridge® support system, the LensGate® Divider System, Tuck-A-Way™ Hip Belt, Rolling Systems, QuickClip™ Tripod Attachment System, Strobe Hatch™/Lens Hatch™, M.A.S.™ Modular Accessory System, Slide Pockets™, Giant Rain Flaps, Piggy-Back Pocket™ and the Debtor's latest innovation — the TurboTop™ (patent pending). Since the Debtor's inception in 1977 and through the present, the Debtor's products have been regarded as the "Cadillac" of its industry.

7. The Debtor's products are sold through hundreds of retail channels throughout North America, South America, Europe, Asia, Australia, and the Middle East. The Debtor's products are also sold online regularly through Amazon.com, as well as major retailers such as Best Buy, Walmart, B&H Photo Video, Adorama, Samy's Camera, and Calumet Photographic. In October 2013, the Debtor made a substantial sale to Costco for just under a million dollars.

<u>Debtor's Liabilities</u>

8. Only one creditor has a lien against substantially all of the Debtor's assets – U.S. Bank National Association ("U.S. Bank"). The debt owed to U.S. Bank arises out of that certain Amended and Restated Loan and Security Agreement dated as of September 30, 2005 (as

subsequently amended) (the "Loan Agreement") pursuant to which U.S. Bank provided the Debtor with certain revolving loans and term loans. The loans made pursuant to the Loan Agreement are also evidenced by the Second Amended and Restated Revolving Loan Note dated April 1, 2009 by the Debtor in favor of U.S. Bank in the original principal amount of $5,000,000.

9. The Debtor's obligations to U.S. Bank under the Loan Agreement have been guaranteed pursuant to the Second Amended and Restated Guaranty dated as of April 1, 2007, by my husband, Ryan Cyr, and me, and the Second Amended and Restated Guaranty dated as of April 1, 2007, by Jessie Cyr and Michael Cyr (Ryan Cyr, Jessie Cyr, Michael Cyr and I are collectively referred to as the "Guarantors"). Additionally, the Guarantors agreed to subordinate any past, present, or future loans made by the Guarantors to the Debtor or security interests in the Debtor's assets to U.S. Bank.

## Events Leadings To The Debtor's Chapter 11 Filing

10. Despite its success and reputation for excellence in its industry, the Debtor began to experience financial difficulty in 2012. Annual sales declined from that time and through the present. Faced with these financial difficulties, the Guarantors continued to make unsecured loans to the Debtor so as to enable the Debtor to continue operating. Notwithstanding the Guarantors' increased financial support to the Debtor, the Debtor defaulted on its obligations to U.S. Bank under the Loan Agreement.

11. On June 26, 2013, the Debtor and U.S. Bank entered into that certain Amendment No. 7 to Amended and Restated Loan and Security Agreement, pursuant to which U.S. Bank agreed to further extend the maturity date of the indebtedness owed under the Loan Agreement. That extension expired on August 15, 2013.

12. In August 2013, the Debtor and U.S. Bank commenced discussions on an out-of-court workout. Those discussions continued from that time until the Petition Date. The parties could not reach agreement, and the Debtor determined that relief under Chapter 11 would provide it with the best means of maximizing the value of its assets for the benefit of its creditors, including U.S. Bank.

///

Utilities

13. The Debtor leases two facilities in Chatsworth, California. The first (9240 Jordan Avenue) is a facility where design, manufacturing, and administrative operations are conducted, and the second (21122 Lassen Street) is a warehouse housing some of the Debtor's inventory. The Debtor receives utility services at each of these facilities, including telephone, internet, water, electricity, and trash disposal, from a number of utility providers (the "Utility Providers"). Attached hereto as **Exhibit A** is a list setting forth, on an account-by-account basis, the name and address of each Utility Provider, the type of utility services furnished by the Utility Provider, the Debtor's account number with the Utility Provider, and the Debtor's average monthly payment to the Utility Provider.

14. For the Debtor to retain its customer base, it must be able to continue taking orders, manufacturing goods, and shipping the completed products in a timely fashion. Obviously, the Debtor's ability to do so is contingent upon the continued receipt of utility services at the two aforementioned facilities.

15. The Debtor proposes to provide "adequate assurance of payment" by making cash deposits for each account in an amount equal to half of the Debtor's average monthly payment on that account. I believe that the proposed treatment constitutes adequate assurance of payment under the circumstances because the Debtor has a consistent history of timely payments to the Utility Providers. The Debtor intends to continue paying the Utility Providers in the ordinary course of business during the pendency of its Chapter 11 case and is concurrently requesting the authority to use sufficient cash collateral to do so.

16. The Utilities Motion should be heard on an emergency basis because the Debtor must provide adequate assurance of payment to the Utility Providers within the first 30 days after the Petition Date or risk termination of utility services. Because uninterrupted utility service is critical to the Debtor's business, it is imperative that the means of providing adequate assurance to the Debtor's Utility Providers be determined immediately.

Employee Wages and Vacation and Leave Benefits

17. The Debtor employs a total of 34 people, 32 of which are full-time, and two of

4

which are part-time[1] (each an "Employee" and collectively, the "Employees").  A complete list of the Employees is attached hereto as **Exhibit B**.

18.   The Employees are paid in arrears on a weekly basis, with each wage period running from Sunday to Saturday.  Independent sales contractors are paid their commissions earned by the 15th of each month for the preceding 30-day period (based on collected accounts receivable) on the 20th of each month. Every Wednesday, the Debtor transfers the total gross amount of the Employees' wages for the prior week to its payroll account, where it is then collected by the Debtor's payroll service, Automatic Data Processing, Inc. ("ADP").  ADP deducts the appropriate amounts for federal and state income tax, Social Security, and certain benefits contributions, and remits the net wages to the Employees on Friday.  The Debtor's average weekly gross payroll for insider and non-insiders is approximately $45,000, which figure includes wages and withholding taxes.  Employees were last paid for the week ending December 28, 2013, on January 3, 2014.

19.   The Debtor pays for health insurance for the Employees through Health Net, Inc. The Debtor's monthly premium for this health insurance is approximately $22,700.  As of the Petition Date, there are no pre-petition amounts due from the Debtor for such health insurance. The Debtor desires to continue having these insurance policies in effect and therefore, seeks authority to continue to honor these pre-petition policies post-petition.

20.   The Debtor provides workers' compensation insurance benefits through ICW Group.  The Debtor's monthly premium for workers' compensation insurance (paid in arrears) is approximately $3,025.

21.   The Debtor also provides the Employees with paid vacation time and paid sick leave. The Debtor's existing policy is to pay out accrued vacation time in its entirety when an Employee leaves the company and to permit Employees to "cash out" 40 hours of vacation time periodically if they have more than the current year's accrued vacation time or if there is a

---

[1] One of the Debtor's two "part-time" Employees is its Chief Restructuring Officer, Howard Grobstein.  Mr. Grobstein is also a founder and partner in Grobstein Teeple LLP, a financial advisory firm, and serves as a member of the Panel of Bankruptcy Trustees in the Central District of California.

5

1  hardship. However, salaried Employees cannot "cash out" sick hours, either during employment
2  or upon termination.

3      22.    In summary, the Debtor is currently obligated to pay the following pre-petition
4  amounts to or on behalf of the Employees: (a) approximately $45,000 in accrued wages and
5  employee withholding taxes for the period from December 29, 2013, through January 4, 2014; and
6  (b) approximately $3,025 in workers' compensation premiums for the period December 1, 2013
7  through December 31, 2013. In addition, the Employees have pre-petition accrued vacation and
8  sick hours in the amounts set forth on **Exhibit B**. All of the Employees listed in **Exhibit B** are
9  still employed by the Debtor.

10      23.    The Employee Motion seeks authority to honor the Debtor's existing leave policies
11  to permit continuing Employees to use their pre-petition accrued leave in the ordinary course of
12  business but does not seek the authority to pay any pre-petition claims based on these leave
13  policies. The Debtor also requests authority to honor, at its discretion, similar leave policies on a
14  post-petition basis and in the ordinary course of the Debtor's business, including the authority to
15  pay the Employees for unused vacation time that accrued within the 180 days prior to the Petition
16  Date when their services with the Debtor are terminated so long as the total of the payments
17  already made for pre-petition Employee obligations and said vacation pay does not exceed
18  $12,475.00.

19      24.    The Employees are aware that the Debtor has entered a Chapter 11 case and they
20  have been assured that the Debtor will endeavor to honor all wage and leave benefit obligations to
21  them. If the Employees do not receive their wages and leave benefits, employee morale will be
22  adversely affected and many of the Employees will likely quit. The loss of any Employees would
23  likely adversely affect the Debtor's ability to operate its business and, in turn, its ability to
24  reorganize and accomplish the other goals of its Chapter 11 case. Accordingly, I believe that
25  making the payments outlined in the Employee Motion is necessary for the Debtor to continue
26  operations and successfully administer its bankruptcy case.

27      25.    Only five Employees are "insiders" of the Debtor - - myself, Ryan Cyr (Executive
28  Vice President), Jessie Cyr (Vice President of Manufacturing, Secretary, and shareholder),

6

Howard Grobstein (Chief Restructuring Officer), and Russell Kantor (Chief Financial Officer and Vice President of Finance). The Debtor is serving a "Notice of Setting/Increasing Insider Compensation" for each of these individuals, whose compensation will be accrued but not paid until the applicable objection period has lapsed.

26. The Debtor will ensure that the Employees will receive no more in value on account of pre-petition claims than the amounts allowed under the priority caps established by 11 U.S.C. § 507(a)(4) and (a)(5). As noted above, the Debtor is only seeking authority to make total actual expenditures of approximately $50,000 on account of pre-petition Employee claims and will ensure that any additional value received by Employees in the form of vacation or sick hours does not cause any Employee to receive more than the allowed total of $12,475.

27. The payments the Debtor seeks authority to make under the Employee Motion will not render the estate administratively insolvent. The amounts to be paid for pre-petition wages, health insurance premiums, and workers' compensation premiums are included in the cash flow projections submitted in connection with the Debtor's use of cash collateral. Any further payments to be made on account of "cashed out" vacation hours will be subject to cash availability.

28. The Employee Motion should be heard on an emergency basis because, as described above, the loss of Employees could cripple the Debtor's operations and jeopardize its reorganization efforts. Further, the Debtor needs to transfer funds to its payroll account by next Wednesday, January 8, 2014, for the Employees to receive timely payment of their weekly wages.

<u>Statutory Lien Claimants</u>

29. The Debtor manufactures a majority of its products in China, and distributes finished products worldwide. The Debtor's pricing policies, marketing strategies, and business operations rely heavily on the Debtor's ability to manufacture and distribute its finished products in a timely fashion. To maintain its operation and distribute products sold in an efficient manner, the Debtor employs a distribution network that uses domestic and international third-party carriers.

30. Specifically, the Debtor's distribution network depends upon the use of reputable domestic and international common carriers and freight forwarders (collectively, the "Shippers")

7

to (1) facilitate the delivery of samples of the Debtor's products to, among others, the Debtor's authorized dealers and manufacturers in China, (2) ship finished products to the Debtor's warehouse facility in Chatsworth, California, and (3) distribute finished products to the Debtor's retail and wholesale customers, some of which are large national retailers. The services provided by the Shippers are essential to the ordinary-course, day-to-day operations of the Debtor's business. At any given time, there are numerous shipments of the Debtor's products en route to or from the Debtor's manufacturing facilities and warehouses. To the extent that the Debtor's products are received from international sources, the Debtor is required to pay customs duty charges and the Debtor utilizes the services of customs brokers who facilitate the payment of the customs duty charges and fees.

31. It is a certainty that Shippers currently are in possession of the Debtor's property, and the delivery of samples and finished products that currently are held by Shippers is vital to maintaining the Debtor's operations during this critical time of transition into Chapter 11. If the Debtor does not pay pre-petition ordinary course obligations owed to these Shippers, the Shippers might refuse to deliver or release such property to the Debtor until they are paid. Such an outcome could cause significant disruptions to the operation of the Debtor's business.

32. Moreover, in the ordinary course of its business, the Debtor also relies upon certain third-party Chinese companies to manufacture or finish goods to the Debtor's exact specifications using samples provided by the Debtor, and then to warehouse the Debtor's finished products at their overseas locations (the "Manufacturers"). Some of the Manufacturers are paid on 30-day terms, while others are paid 30% when an order is placed, and 70% when production is completed. These Manufacturers and other third-party warehousers in China (the "Warehousers" and, together with the Shippers and Manufacturers, collectively, the "Statutory Lien Claimants") hold the Debtor's finished and unfinished products and may refuse to release them pending payment from the Debtor in satisfaction of their claims, thereby disrupting the Debtor's operations. At any given time, in the ordinary course of business, the Manufacturers may be performing services on, and therefore have possession of, the Debtor's supplies, work in progress and finished products. At present, the Manufacturers and Warehousers are storing a substantial majority of the Debtor's

8

inventory in China, and will not release that inventory until their invoices, which likely will become due between January and mid-February 2014, are paid.

33. The Debtor's ability to timely receive, distribute and fulfill sales orders depends on the maintenance of a successful and efficient system of transportation, and any disruption of the delivery or return of product or merchandise could have an immediate and devastating impact on the Debtor's operations. Additionally, any disruption in the Debtor's access to its products currently warehoused by the Chinese manufacturers would have an equally immediate and devastating impact on the Debtor's operations. Therefore, Debtor's business operations and the value of its enterprise depends in very large part on the maintenance of reliable and efficient transportation for product and merchandise, as well as the prompt payment, in the ordinary course of business, of the claims of the Statutory Lien Claimants.

34. The Debtor estimates that the amount due or soon to be due to the Statutory Lien Claimants is approximately $210,000. The vast majority of that amount comprises amounts that are or soon to be owed to Manufacturers for finished products paid for on 30-day terms. A smaller portion of that amount comprises payments owed to Shippers for products currently in shipping containers in international waters that are expected to arrive at the Debtor's warehouse facility in the next 30 days. In the cases of both the Manufacturers and the Shippers, the Debtor is obligated to pay amounts due for those companies to release the Debtor's products in their possession, as well as their possessory liens. The amount of the pre-petition claims sought to be paid by the Lien Claimants Motion are far outweighed by the value added to the estate by way of inventory that will be released to the Debtor, as well as the Debtor's continuing and uninterrupted operation of its business. If the Court were to approve the Debtor's proposed payments, the Debtor has allocated sufficient funds in its cash collateral budget to make such payments.

35. The Lien Claimants Motion should be heard on an emergency basis, because immediate and irreparable harm is likely to result if the Debtor is not permitted to pay the charges of the Statutory Lien Claimants. As described above, payment of these charges is an integral and inseparable part of the operation of the Debtor's business. The relief requested in the Lien Claimants Motion is necessary for the continued manufacture, sale, and delivery of the Debtor's

9

products. If the Debtor is not permitted to pay the Statutory Lien Claimants, and they in turn refuse to release the Debtor's products, a severe disruption of the operation of the Debtor's business would result.

<u>Use of Cash Collateral and Post-Petition Financing</u>

36. Pursuant to the Cash Collateral Motion, the Debtor seeks the Court's authorization to enter into the Stipulation Regarding Use of Cash Collateral and Provision of Adequate Protection (the "Stipulation") attached as **Exhibit 1** to the Cash Collateral Motion, pursuant to which U.S. Bank has consented to the Debtor's use of cash collateral through and including February 4, 2014 (the "Budget Period") in accordance with the Debtor's operating budget (the "Budget"), subject to a 10% overall variance. The Budget reflects those ordinary expenses that the Debtor must pay in order to continue operating and to preserve the going concern value of its business. A copy of the Budget is attached as **Exhibit 2** to the Cash Collateral Motion

37. The Stipulation with U.S. Bank requires that the Debtor obtain post-petition financing in the form of an unsecured loan by the Guarantors. In accordance with that requirement, and the Debtor's need for additional cash during the Budget Period, the Debtor has negotiated and arranged for an unsecured loan in the initial amount of $200,000 to be made by the Guarantors (the "Post-Petition Financing").

38. The essential terms of the Post-Petition Financing are as follows:

- <u>Amount</u>: the Guarantors commit to provide the Debtor with $200,000 in post-petition financing;
- <u>Unsecured and subordinated</u>: the Post-Petition Financing is unsecured and subordinated to the Debtor's obligations to U.S. Bank under the Loan Agreement; the Guarantors expressly waive any right to request administrative expense priority pursuant to section 503 of the Bankruptcy Code on account of the Post-Petition Financing;
- <u>Interest</u>: interest accrues at the current Treasury bill rate of .39%; and
- <u>Maturity date</u>: the repayment of the Post-Petition Financing becomes due on January 1, 2017, except that no payment shall be required unless holders of

10

unsecured claims against the Debtor's estate are to receive any payment on account of their claims.

39. The proceeds of the Post-Petition Financing will be used to fund the Debtor's operations in accordance with the Budget. Given the Debtor's current circumstances, the Debtor could not obtain any financing for its operations from any third party other than the Guarantors.

40. In addition to the proceeds of the proposed Post-Petition Financing, the only source of money available to the Debtor to use to operate its business is the Debtor's current cash on hand and collections of its accounts receivable. As a result, the Debtor has no ability to continue to operate its business and maintain the going concern value of the Debtor's business unless the Debtor has immediate access to and use of its cash collateral and the additional financing provided by the Guarantors to pay the Debtor's ordinary expenses set forth in the Budget.

41. It is imperative that the Debtor be able to use cash collateral. The Debtor must be able to continue to use its cash to pay its post-petition operating expenses, including payroll, rent, utilities, etc., so that it can continue collecting on its outstanding accounts receivable and remain in business. The value of the Debtor's business would deteriorate quickly and significantly if the Debtor cannot continue to fill customers' orders and to generally operate its business in a smooth and uninterrupted fashion. An inability to pay the expenses set forth in the Budget would cause immediate and irreparable harm to the Debtor, its business, and the Debtor's reorganization efforts.

## Cash Management

42. Tamrac currently maintains a general account and a payroll account (the "Pre-Petition Accounts") at U.S. Bank. Tamrac has sought to open general, payroll, and tax debtor-in-possession accounts at U.S. Bank (the "DIP Accounts") but has been informed that it will be several days before they are ready for use.

43. Tamrac's operations will be severely disrupted and the fate of its Chapter 11 case will be jeopardized if Tamrac is unable to expend funds on necessary operating expenses for several days. In particular, Tamrac is obligated to fund its employee payroll on Wednesday, January 8, 2014.

11

44. Although the Cash Management Motion seeks authorization to continue using Tamrac's Pre-Petition Accounts until the DIP Accounts are ready, Tamrac will ensure that (a) no transfers are made from the Pre-Petition Accounts until the Court grants the Cash Collateral Motion and (b) no pre-petition debts are paid from the Pre-Petition Accounts except as authorized by an order of the Court.

45. Under the Stipulation in connection with the Cash Collateral Motion, U.S. Bank will open and maintain a cash collateral account in Tamrac's name (the "Cash Collateral Account"). Once the Cash Collateral Account and DIP Accounts are ready, Tamrac will transfer all of the funds remaining in its Pre-Petition Accounts into the Cash Collateral Account. Subsequent receipts will also be deposited into the Cash Collateral Account. At the end of each business day, U.S. Bank will sweep funds from the Cash Collateral Account into Tamrac's general DIP Account, as set forth in the Stipulation, and Tamrac can then expend the funds as necessary.

46. Approval of the post-petition cash management system described in paragraph 45 above is necessary and appropriate under the circumstances, because all of the Debtor's revenue constitutes U.S. Bank's cash collateral and U.S. Bank will not authorize the use of its cash collateral unless it can maintain control over the funds through the use of the Cash Collateral Account.

I declare under penalty of perjury that the foregoing is true and correct and, if called as a witness, I could and would testify competently to the facts set forth herein.

Executed this 6th day of January, 2014, at Los Angeles, California.

/s/ Jesselyn T. Cyr
Jesselyn T. Cyr

# EXHIBIT A

**Tamrac, Inc.**
**List of Utilities**

| Description | Vendor# | Name | Address | City | State | Zip | Telephone | Account # | Est Mo. Amt. | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| Telephone | 253 | AR&T (Acct 8310003747145) | P.O. Box 5019 | Carol Stream | IL | 60197 | (800) 235-7524 | 831-000-3747-145 | $807.45 | =Internet |
| Telephone-DSL | 255 | AT&T | P.O. Box 5019 | Carol Stream | IL | 60197 | (800) 235-7524 | 831-000-0043-380 | $99.95 | =DSL Line |
| Telephone-DSL | 255 | AT&T | P.O. Box 5019 | Carol Stream | IL | 60197 | (800) 235-7524 | 831-000-0069-790 | $99.95 | =DSL Line |
| Telephone | 260 | AT&T Mobility | P.O. Box 6463 | Carol Stream | IL | 60197 | (800) 331-0500 | 287236824789 | $108.90 | =5 Wireless phones |
| Telephone | 270 | AT&T Long Disrance | P.O. Box 5017 | Carol Stream | IL | 60197 | (877) 366-3200 | Corporate ID#182072 | $217.86 | =IBAN |
| Telephone | 273 | AT&T | P.O. Box 5025 | Carol Stream | IL | 60197 | (800) 321-2000 | 960-461-1000-555-8 | $1,664.21 | =Ref#818-407-9500 |
| Telephone | 282 | AT&T | P.O. Box 105068 | Atlanta | GA | 30348 | (800) 847-3595 | 050-841-5021-001 | $40.90 | =Ref#818-709-5966 |
| Telephone | 282 | AT&T | P.O. Box 105068 | Atlanta | GA | 30348 | (800) 847-3595 | 050-579-1236-001 | $54.42 | =Ref#818-709-8565 |
| Telephone | - | AT&T (Authentic Traveler LLC) | P.O. Box 5025 | Carol Stream | IL | 60197 | (800) 750-2355 | 818-576-0993-342-4 | $62.21 | =Ref#818-576-0993 |
| Telephone | 2522 | Verizon Wireless | P.O. Box 660108 | Dallas | TX | 75266 | (800) 922-0204 | 960289431-00001 | $1,600.00 | |
| | | Verizon Correspondence Address: Attn: Correspondence T | | Wallingford | CT | 06492 | | | | |
| Water/Electric (Whse) | 940 | L.A. Dept of Water and Power | P.O. Box 30808 | Los Angeles | CA | 90030 | (800) 499-8840 | 101-750-1000 | $24.72 | |
| Water/Electric (Whse) | 940 | L.A. Dept of Water and Power | P.O. Box 30808 | Los Angeles | CA | 90030 | (800) 499-8840 | 200-750-1000 | $1,044.13 | |
| Water/Electric (Office) | 940 | L.A. Dept of Water and Power | P.O. Box 30808 | Los Angeles | CA | 90030 | (800) 499-8840 | 509-698-0000 | $679.23 | |
| Water/Electric (Office) | 940 | L.A. Dept of Water and Power | P.O. Box 30808 | Los Angeles | CA | 90030 | (800) 499-8840 | 609-698-0000 | $4,094.05 | |
| Gas (Whse) | 2160 | The Gas Company | P.O. Box C | Monterey Park | CA | 91756 | (800) 427-2000 | 084-211-1100-9 | $16.27 | |
| Gas (Office) | 2160 | The Gas Company | P.O. Box C | Monterey Park | CA | 91756 | (800) 427-2000 | 191-811-6800-6 | $18.43 | |
| Trash (Whse) | 760 | Crown Disposal | P.O. Box 1081 | Sun Valley | CA | 91352 | (818) 767-0675 | Customer #078878 | $88.33 | |
| Trash (Office) | 760 | Crown Disposal | P.O. Box 1081 | Sun Valley | CA | 91352 | (818) 767-0675 | Customer #038716 | $88.33 | |

Total Est Monthly Utilities = $10,809.34

EXHIBIT A

13

# EXHIBIT B

TAMRAC, Inc.  
HR ADMIN - PAYROLL BENEFITS ANALYSIS  
Rev 1/4/14  3:11 pm

**VACATION LIABILITY BALANCE - PROX A/O 1/4/14 - EXCESS REPORT**
**SICK PAY LIABILITY BALANCE - A/O 1/4/14 - EXCESS REPORT**

| Employee Name | Hourly Rate | 1/4/2014 Acc Balance | 1/4/2014 Prorata | Total Hrs | Hours 180 Days | Allowable Hrs | Allowable Gross | Hours Excess | Excess $ | 1/4/14 Sick Acc | Total Gross |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Felman, Ricardo | $ 27.54 | 166 | 4.7 | 170.7 | 60 | 60 | $ 1,652.40 | 110.7 | $ 3,048.68 | | $ 4,701.08 |
| Calles, Jose | $ 11.77 | 14 | 3.1 | 17.1 | 40 | 17.1 | $ 201.27 | -22.9 | $ - | | $ 201.27 |
| Garcia, Armando | $ 13.91 | 0.2 | 3.3 | 3.5 | 40 | 3.5 | $ 48.69 | -36.5 | $ - | | $ 48.69 |
| Cortez, Vickie | $ 15.92 | 35.6 | 1.1 | 36.7 | 40 | 36.7 | $ 584.26 | -3.3 | $ - | | $ 584.26 |
| Taylor, Daisy | $ 25.50 | 111 | 0.7 | 111.7 | 60 | 60 | $ 1,530.00 | 51.7 | $ 1,318.35 | | $ 2,848.35 |
| Ayala, Patricio | $ 11.28 | 65.4 | 0.7 | 66.1 | 40 | 40 | $ 451.20 | 26.1 | $ 294.41 | | $ 745.61 |
| Cardona, Gerardo | $ 11.77 | 44.8 | 6.4 | 51.2 | 40 | 40 | $ 470.80 | 11.2 | $ 131.82 | | $ 602.62 |
| Espindola, Miguel | $ 9.96 | 68 | 0.0 | 68 | 40 | 40 | $ 398.40 | 28 | $ 278.88 | | $ 677.28 |
| Hernandez, Oscar | $ 8.97 | 42.3 | 1.5 | 43.8 | 40 | 40 | $ 358.80 | 3.8 | $ 34.09 | | $ 392.89 |
| Lainez, Jorge | $ 11.96 | 5.8 | 4.4 | 10.2 | 40 | 10.2 | $ 121.99 | -29.8 | $ - | | $ 121.99 |
| Lainez, Nelson | $ 20.60 | 90 | 9.7 | 99.7 | 60 | 60 | $ 1,236.00 | 39.7 | $ 817.82 | | $ 2,053.82 |
| Cyr, Jesselyn | | n/a | | | | | $ - | | $ - | | $ - |
| Cyr, Jessie | | n/a | | | | | $ - | | $ - | | $ - |
| Cyr, Ryan | | n/a | | | | | $ - | | $ - | | $ - |
| Kantor, Russell | $ 71.54 | 40.6 | 11.6 | 52.2 | 80 | 52.2 | $ 3,734.39 | -27.8 | $ - | | $ 3,734.39 |
| Haendiges, Rhonda | $ 29.94 | 50 | 0.3 | 50.3 | 60 | 50.3 | $ 1,505.98 | -9.7 | $ - | | $ 1,505.98 |
| Roche', Mary Ann | $ 13.42 | 100 | 5.0 | 105 | 60 | 60 | $ 805.20 | 45 | $ 603.90 | 0.00 | $ 1,409.10 |
| Davis, Brian | $ 29.06 | 170.4 | 2.4 | 172.8 | 60 | 60 | $ 1,743.60 | 112.8 | $ 3,277.97 | | $ 5,021.57 |
| Davis, Bruce | $ 73.77 | 92 | 1.0 | 93 | 60 | 60 | $ 4,426.20 | 33 | $ 2,434.41 | | $ 6,860.61 |
| Hulme, Castine | $ 29.82 | 22 | 7.3 | 29.3 | 60 | 29.3 | $ 873.73 | -30.7 | $ - | | $ 873.73 |
| Reinick, Robert | $ 64.83 | 158 | 1.0 | 159 | 60 | 60 | $ 3,889.80 | 99 | $ 6,418.17 | | $10,307.97 |
| Smarius, Hans | $ 71.54 | 54 | 1.0 | 55 | 60 | 55 | $ 3,934.70 | -5 | $ - | | $ 3,934.70 |
| Blin, Cathy | $ 38.27 | 100.3 | 1.8 | 102.1 | 80 | 80 | $ 3,061.60 | 22.1 | $ 845.77 | | $ 3,907.37 |
| Rodriguez, Jacinta | $ 15.07 | 218.6 | 0.9 | 219.5 | 60 | 60 | $ 904.20 | 159.5 | $ 2,403.67 | | $ 3,307.87 |
| Dilingham, Chris | $ 27.75 | 78 | 4.0 | 82 | 60 | 60 | $ 1,665.00 | 22 | $ 610.50 | | $ 2,275.50 |
| Kish, Terri | $ 23.25 | 116 | 4.7 | 120.7 | 60 | 60 | $ 1,395.00 | 60.7 | $ 1,411.28 | | $ 2,806.28 |
| Rury, Lynn | $ 30.81 | 16.6 | 6.0 | 22.6 | 60 | 22.6 | $ 696.31 | -37.4 | $ - | | $ 696.31 |
| Solano, Linda | $ 26.79 | 0 | 0.0 | 0 | 40 | 0 | $ - | -40 | $ - | | $ - |
| Weiss, Patricia | $ 28.40 | 70 | 5.0 | 75 | 60 | 60 | $ 1,704.00 | 15 | $ 426.00 | | $ 2,130.00 |
| Dibiase, Karen | $ 34.61 | 52 | 8.2 | 60.2 | 60 | 60 | $ 2,076.60 | 0.2 | $ 6.92 | | $ 2,083.52 |
| Overton, Cathie | $ 17.93 | 48.5 | 9.0 | 57.5 | 60 | 57.5 | $ 1,030.98 | -2.5 | $ - | 0.00 | $ 1,030.98 |
| Ramos, Rosie | $ 23.16 | 50 | 6.0 | 56 | 60 | 56 | $ 1,296.96 | -4 | $ - | | $ 1,296.96 |
| Dela Cruz, Mary | $ 24.59 | 105.4 | 1.0 | 106.4 | 60 | 60 | $ 1,475.40 | 46.4 | $ 1,140.98 | | $ 2,616.38 |
| **TOTAL** | | | | | | | **$43,273.45** | | **$25,503.60** | **0.00** | **$68,777.04** |

**Employer Taxes Liability**

| | | | |
|---|---|---|---|
| FICA 7.65% | $ 3,310.42 | $ 1,951.03 | $ 5,261.44 |
| FUTA 0.6% | $ 259.64 | $ 153.02 | $ 412.66 |
| SUI 6.2% | $ 2,682.95 | $ 1,581.22 | $ 4,264.18 |
| **TOTALS** | **$ 6,253.01** | **$ 3,685.27** | **$ 9,938.28** |

EXHIBIT B  
14